Argued March 2, affirmed May 19, 1965

## MILLER *v.* HARDER ET AL

402 P. 2d 84

*Walter H. Sweek,* Portland, argued the cause for appellant. With him on the briefs were Vergeer & Samuels, Portland.

*Gerald R. Pullen,* Portland, argued the cause for respondents. With him on the brief were Hershiser, McMenamin, Blyth & Jones, Portland.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

SLOAN, J.

Defendant Masson, an employee of the other two defendants, drove a truck belonging to the latter into the back end of a car in which plaintiff was riding. Plaintiff brought this action, but defendants prevailed by a jury verdict. Plaintiff appeals. She claims that the trial court should not have refused to direct a verdict in her favor.

The facts are similar to those reported in *Lehr v. Gresham Berry Growers et al,* 1962, 231 Or 202, 372 P2d 488. Plaintiff relies on that case to sustain her contention.

In the instant case plaintiff was riding in a car driven by a Mrs. Rusher along Grand avenue in Portland. Grand avenue is a three-lane one-way street. At the intersection of Grand and Weidler was a traffic light which controlled the flow of traffic at the intersection. According to Mrs. Rusher's testimony the traffic light changed from green to yellow as she approached the intersection and she brought her car to a gradual stop. Masson, following about one car length behind, collided with the Rusher car.

Masson testified that the light changed just as the Rusher car was entering the intersection. He stated that the Rusher car proceeded into the intersection a few feet before stopping. He explained that this caused him to believe that the car was not going to

stop but was going through the intersection. Instead of that, he claimed, the car stopped suddenly and that this action of the Rusher car caused him to collide with it. Plaintiff's motion for a directed verdict requires that defendants' evidence be taken as true. Defendants argue that it was for the jury to decide if Masson was negligent under the circumstances.

We have concluded that *Lehr v. Gresham Berry Growers, et al,* supra, must be overruled. We will not reargue the merits of the case. The case has become, however, a matter of much concern to this court, and we are sure, of greater concern to the trial practice. Since the decision in the case we have had many cases presented in which it has been claimed that the *Lehr* decision controls. As a result we have been obliged to attempt to analyze and weigh factual patterns that vary from the facts in the *Lehr* case in differing degrees. *Jaeger v. Estep,* 1963, 235 Or 212, 384 P2d 175; *Wilson v. Clark,* 1964, 238 Or 126, 393 P2d 659; *Rough v. Lamb,* 240 Or 240, 401 P2d 10, and other cases still pending. We are sure that this has become a much greater problem to the trial courts.

Experience has taught that for the court to attempt to measure the varying facts in each of these cases against the pattern of facts in the *Lehr* case and to then decide as a matter of law how well each new case fits the pattern is unsound, if not unworkable. The deviation from the peculiar facts of *Lehr* change with each case, and we have concluded that the court is actually doing the jury work of matching facts against the reasonable man test.

■■ In addition, the complexities of traffic conditions range from two or three cars following in a single lane of travel to bumper to bumper traffic in multi-lane

streets and highways; from highway traffic uncontrolled by signals to urban controlled traffic. In these rear end collision cases whether or not a statutory rule such as following too closely, the giving of a signal, or speed has been violated in a given case should be left for the jury under proper instruction. This is equally true of the non-statutory duties. These considerations have caused us to reach the conclusion that we should follow the earlier cases cited in the dissenting opinion in the *Lehr* case and submit these cases to the jury.

A second assignment claims that the court erred in withdrawing a specification charging excessive speed. The only evidence on speed was that Masson was driving at 20 miles per hour. There was not sufficient evidence to support the claim of excessive speed as a separate allegation. The jury could, and no doubt did, consider the matter of speed as a part of the charge of lack of control. It was not error to withdraw the allegation. *Krening v. Flanders,* 1961, 225 Or 388, 358 P2d 574.

Affirmed.

PERRY, J., specially concurring.

I concur in the result reached by the majority as I am of the opinion that questions of fact were raised by the evidence which should be determined by the jury. However, I do not agree with the reasoning of the majority.

As stated by the majority, the plaintiff was riding in an automobile proceeding along Grand Avenue in Portland. The defendant David Masson was following in his motor vehicle and struck the vehicle in which

plaintiff was riding. The facts of this occurrence were stated by the defendant as follows:

"Q  Tell us what happened, Mr Masson.

"A  We come along—as we come to Weidler Street, the driver of the car in front of me suddenly stopped and she was over the line of Weidler when the light changed. The light just changed there and she suddenly stopped, all of a sudden; it took my breath away. I slammed on my brake, but I still bumped her.

"*  *  *  *  *

"Q  There are traffic lights at the scene, is that right?

"A  Yeah, yeah.

"Q  Did you notice what color the traffic light was when the other car stopped?

"A  It was yellow when she—when she stopped. She was over the line then. I mean, over Weidler, beginning of the line on Weidler.

"Q  Did the light change to yellow at the same time she stopped?

"A  Well, just as the light just changed to yellow and she slammed on her brakes all of a sudden.

"Q  Now, at the scene, Mr. Masson, did you look at the two vehicles? Did you look at the bumpers?

"A  Yes.

"Q  Was there any damage at all?

"A  None whatever, and the driver of the other car admitted that, too.

"*  *  *  *  *

"Q  You were watching that car, of course, weren't you?

"A  Yes.

"Q  You did hit it?

"A  I did hit it, yeah, the bumper.

"Q  As a matter of fact, you were sort of day-dreaming there, weren't you?

"A  I was what?

"Q  Sort of daydreaming along there, day-dreaming?

"A  No, I was not daydreaming. I was looking right in front of me.

"*  *  *  *  *

"A  That's correct. I said she suddenly stopped and it kind of surprised me that she did stop when she was over the line. When the yellow—when the yellow light turned, turned from green to yellow, she was over the line and the other car beside her went on."

Mrs. Rusher, the driver of the car in which plaintiff was riding, stated:

"Q  Could you tell us, Mrs. Rusher, how far from the intersection your car was when you saw the light change from green to yellow?

"A  Well, it was just, it was just turning yellow when I was approaching the signal and so I stopped.

"Q  All right. If I draw an imaginary dotted line from curb to curb and I call that a curb line, can you tell us how close you were to the curb line when the light changed from green to yellow?

"A  I don't know what you mean by curb line. I was driving in the line of traffic.

"Q  Perhaps I can explain. This line extends across from one curb to another curb (indicating) and can you see the dotted line all right?

"A  Yes.

"Q  And I'm just calling that the curb line. What I'm trying to find out now is, Mrs. Rusher, how close to this curb line your car was when you saw the light change from green to yellow?

"A  You mean when the front of my car—you mean when I was coming to the intersection?

"Q  Yes.

"A  Well, I couldn't tell how far, I just saw it change and just came right to the intersection. I just couldn't tell you how—

"Q  You can't give us any estimate as to how close you were?

"A  Well, no, because I was just right there at the intersection.

"Q  All right. You were right at the intersection when the light changed to yellow.

"A  When I stopped, I was right at the intersection, yes."

Traffic at this intersection was controlled by a traffic light which flashed green for "go", yellow for "caution" and red for "stop."

ORS 483.130 provides:

"Whenever traffic is controlled by traffic control signals exhibiting the words "Go," "Caution" or "Stop" or exhibiting different colored lights successively one at a time, or with arrows, said lights, arrows and terms shall indicate and apply to drivers of vehicles and pedestrians as follows:

"(1) Green alone or "Go." Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits such turn, but vehicular traffic shall yield the right of way to pedestrians and other vehicles lawfully within a crosswalk or the intersection at the time such signal is exhibited. Pedestrians facing the signal may proceed across the roadway within any marked or unmarked crosswalk unless prohibited from doing so by other signs or signals.

"(2) Yellow alone or "Caution" when shown following the green or "Go" signal. Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at the intersection or at such other point as may be designated by the proper traffic authority. However, if such stop cannot be

made in safety, a vehicle may be driven cautiously through the intersection. No pedestrian facing such signal shall enter the roadway.

"(3) Red alone or "Stop." Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at an intersection or at such other point as may be designated by the proper traffic authority. Except as provided in ORS 483.132, such traffic shall remain standing until green or "Go" is shown alone. No pedestrian facing such signal shall enter the roadway.

"* * * * *."

Everyone who has operated a motor vehicle knows that, after the set period for any color has expired, the change to another color is then immediate. To provide a warning period between the green "Go" signal and the red absolute "Stop" signal a yellow warning signal is provided.

It must be kept in mind that these signals direct pedestrian traffic as well as vehicular traffic at intersections. It seems therefore clear that the statutory duty of motor vehicle drivers to stop at a point designated by the statute when a yellow light appears depends upon whether the stop can be made safely when this light first appears, since the statute makes provision for the circumstances existing when the light changes; i.e., the automobile "shall stop before entering the nearest crosswalk," so that pedestrian travel will not be blocked or interfered with, or at such other point as may be "designated" by proper "authority." If such stop cannot be made where the stop should be made because of the short notice, then the driver can, without violating the statute, drive cautiously through the intersection.

In my opinion, when it appears that an automobile does not stop at the place designated when the yellow

light suddenly appears, the driver of the following car can rightfully assume that the proceeding car could not stop as directed by statute and, in the absence of other circumstances, will then proceed on through the intersection.

Therefore, in this case a question of fact was raised as to whether the sole proximate cause of the collision was the sudden stop of the vehicle in which plaintiff was riding, after having passed the proper stopping place and not proceeding through the intersection, or was the negligence or non-negligence of the defendant in following too close, in not maintaining a proper lookout or in failing to have his vehicle under proper control.

The facts in this case bear no relation to those set out in *Lehr v. Gresham Berry Growers et al.*, 231 Or 202, 372 P2d 488. In that case, the plaintiff was riding in an automobile approaching a "flashing" yellow light, followed by the defendant's truck. The statute controlling such a light, ORS 483.136, provides that "drivers of vehicles may proceed through the intersection or past such signal only with caution." Clearly, this puts the duty of determining whether to stop or not upon the driver first approaching the signal and if, as in the *Lehr* case, there were children on or about the crosswalk who might suddenly start to cross, or other such circumstances, it would then create a judgment problem for the first driver. It would be most unrealistic if in such a situation the driver of the car following could make that decision for the forward driver. This reasoning, of course, disposed of the defendant's contention in that case that the jury could have found that the driver of the car in which plaintiff Lehr was riding was in anywise negligent.

It is also a fact in the *Lehr* case, derived from the

defendant's own evidence, that the driver of defendant's truck failed to maintain a proper lookout or have his vehicle under control so that if the vehicle ahead made a lawful stop he would not strike that vehicle, for he offered no excuse for lack of lookout or control, such as a distracting circumstance as is found in *Jaeger v. Estep*, 235 Or 212, 384 P2d 175, *Wilson v. Clark*, 238 Or 126, 393 P2d 659, and *Rough v. Lamb*, 240 Or 240, 401 P2d 10.

It seems highly unreasonable for this court to overrule the *Lehr* case and thus hold that, even though a person obeys the mandate of the law, a jury can still find negligence. Also, when there is no question of fact for the jury to decide, to permit the jury then to determine the law of the case.

The majority do not say the *Lehr* case is wrong. They overrule that decision simply because they feel that the lawyers, trial courts and the members of this court are unable to "analyze" and "weigh factual patterns."

"The ability to think is to a large extent the ability to make accurate distinctions." Aristotle.

Courts are constantly called upon to make "accurate distinctions" between factual situations in order to determine the sufficiency of evidence to take a negligence case to the jury. Simply because in some instances that task may be difficult is a poor reason for overruling a decision concerning which as recently as July, 1963, Mr. Justice ROSSMAN, speaking for a unanimous court, sitting in banc, said: "We have complete confidence in the Lehr decision and no desire to weaken it or detract from it." *Jaeger v. Estep*, 235 Or 212, 234, 384 P2d 175.

I concur in the opinion of the majority because the

driver of the automobile in which the plaintiff was riding, after having failed to make a proper stop, could be found by a jury to be negligent in not then proceeding cautiously through the intersection in the absence of evidence to show that to proceed would have been dangerous, or the jury could find the defendant not negligent under these circumstances.

GOODWIN and HOLMAN, JJ, concur in this opinion.